UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                        Plaintiff

v.                                        Criminal Action No. 3:17-cr-87-RGJ

JEFFREY CAMPBELL, MARK DYER,                                        Defendant
PHYSICIANS PRIMARY CARE, PLLC

* * * * *

## MEMORANDUM OPINION AND ORDER

A federal grand jury indicted Jeffrey Campbell ("Campbell"), Mark Dyer ("Dyer"), and

Physicians Primary Care, PLLC ("PPC") (collectively, "Defendants") in a twenty-four-count

indictment. [DE 1; DE 55; DE 66; DE 110]. After a six-week trial, a jury convicted Campbell,

Dyer, and PPC of Count 1 (conspiracy to unlawfully distribute and dispense a controlled

substance), Count 10 (conspiracy to commit health care fraud), and Count 24 (money laundering).

[DE 272 1996-97]. The jury also convicted Campbell of Counts 11-19 (health care fraud) and

Dyer and Campbell of Count 22 (health care fraud). *Id.*

At the close of the United States' case, Defendants moved for judgment of acquittal. The

Court's ruling denying their motion included both an extensive discussion of the evidence in the

case and numerous citations to applicable case law. Defendants[1] now timely renew their motion

for a judgment of acquittal under Fed. R. Crim. P. 29 for Counts 1, 10, 11-19, 22, and 24 or, in the

alternative, a new trial under Fed. R. Crim. P. 33. [DE 272 at 1995]. The United States responded.

[DE 287]. This matter is ripe. Having considered the parties' filings and the applicable law, the

Court **DENIES** Defendants' Motion [DE 271; DE 272].

---

[1] Campbell, Dyer, and PPC filed a joint motion for judgment of acquittal or, in the alternative, a new trial.

# I.  STANDARD

A court should grant a motion for judgment of acquittal under Rule 29 only when the evidence admitted at trial, viewed in the light most favorable to the United States, was insufficient to permit a rational trier of fact to find guilt beyond a reasonable doubt.  *United States v. Connery*, 867 F.2d 929, 930 (6th Cir. 1989) (citations omitted).  Put differently, a court should not grant a motion of acquittal unless "'the prosecution's failure is clear.'"  *Id.*  (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978).   In evaluating challenges to sufficiency of evidence, courts must not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury."  *United States v. Siemaszko*, 612 F.3d 450, 462 (6th Cir. 2010) (citations and quotation omitted).   "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.'"  *United States v. Meyer*, 359 F.3d 820, 826 (6th Cir. 2004) (quoting *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (citation and quotation omitted)).

# II.  DISCUSSION

## A.    Count 1: Conspiracy to Distribute Controlled Substances

To prove conspiracy to unlawfully distribute controlled substances, the United States must establish: "(1) an agreement to violate drug laws, in this case 21 U.S.C. § 841(a)(1); (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy."  *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005).   "[P]roof of a formal agreement is not necessary; 'a tacit or material understanding among the parties' will suffice." *United States v. Avery,* 128 F.3d 966, 970–71 (6th Cir.1997)  (quoting *United States v. Pearce,* 912 F.2d 159, 161 (6th Cir.1990)). The existence of a conspiracy "'may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'" *Id.* at 971 (citation omitted).   Once a

conspiracy is shown however, a defendant's connection to the conspiracy "need only be slight." *Id.* "Moreover, a defendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence." *Martinez*, 430 F.3d at 330. As to the timeframe of the conspiracy, "an indictment that is open-ended as to beginning dates but not end dates suffices." *United States v. Vassar*, 346 F. App'x 17, 22 (6th Cir. 2009).

The United States presented evidence that: (1) PPC providers, including Campbell and Dyer, prescribed high volumes and dangerous combinations of controlled substances; (2) Nurse practitioners, including Dyer, had access to and used Campbell's pre-signed prescription pads and Campbell and other PPC providers signed prescriptions without reviewing charts or examining patients; and (3) Campbell and Dyer ignored "red flags" about the practice and its patients. From this evidence, as well the other evidence in the record, a rational trier of fact could find that Defendants agreed to form, intentionally and knowingly entered, and participated in a conspiracy to unlawfully distribute controlled substances.

1. High volumes and dangerous combinations of controlled substances

Witnesses testified that PPC providers prescribed high volumes of opiates and other controlled substances. [*See, e.g.*, DE 299 at 3683]. Local pharmacists who filled these prescriptions, such as Anthony Westmoreland and James Farley, noticed concerning trends in the prescribing habits of these providers. *Id.* Westmoreland observed "overprescribing, prescribing the same items over and over with no real sort of plan that was apparent to us anyway, prescribing cocktails that were red flags." *Id.* Westmoreland filed a complaint against Campbell and PPC with the Indiana Board of Pharmacy. *Id.* PPC providers were "prescribing—in addition to the opioids, there would be benzodiazepines and muscle relaxers. This is, you know, the holy trinity, the—as it's known on the street." *Id.* at 3683-84. Farley filed a complaint against Campbell and PPC with

the Drug Enforcement Administration ("DEA"). [DE 300 at 3712]. Farley testified that PPC providers were prescribing such high volumes of Oxycodone that the pharmacies he worked at would run out of Oxycodone after filling the prescriptions for PPC patients. *Id.* at 3714-18. Melody Dixon, a medical assistant who worked for Dyer, testified that Dyer prescribed ninety to ninety-five percent of his patients controlled substances, such as Lortab and Percocet. [DE 305 at 3912]. She also testified that PPC providers prescribed opiates to ninety percent of PPC patients. *Id.* at 3925.

Along with prescribing high volumes of controlled substances, PPC providers routinely prescribed dangerous drug combinations. *See United States v. Otuonye*, 995 F.3d 1191, 1211 (10th Cir. 2021) (conviction for conspiracy to distribute found sufficient, in part, due to evidence of both distribution of high volume of drugs and drugs in dangerous combinations). Dr. John Baird worked at PPC from June 2013 until March 2015. [DE 312 at 4099, 4143]. He testified that the charts he reviewed were "scary":

> Q. Okay. And during that time period as a physician, what did you notice about those charts?
>
> A. They were scary. Basically what I saw was a lot of combination of medications that very few—very few nurse practitioners prescribe that I've ever seen and also very few primary care physicians prescribe. In Kentucky we have a thing called the cocktail which is muscle relaxants, benzodiazepines for depression, and opioids. And the majority of patients were on those three at very high doses.
>
> Q. And why is that concerning?
>
> A. Because the abuse potential of them is so high and it's actually—it's very sought after for people who are addicts.

*Id.* at 4083.

Dr. Timothy King and Dr. William Denham, two expert witnesses for the United States, reviewed PPC patient files, including the files of patients treated by Campbell and Dyer. [DE 294

at 3196; DE 284 at 2494]. Both Dr. King and Dr. Denham opined that Campbell and Dyer issued some prescriptions without a legitimate medical purpose and outside the usual course of professional practice. [DE 294 at 3260, 3283, 3298, 3303, 3323; DE 284 at 2577, 2605, 2636, 2639, 2669].

Dawn Antle, a nurse practitioner, admitted to prescribing high doses and dangerous combinations of controlled substances to her patients. [DE 298 at 3674]. Indeed, she conceded that while at PPC she prescribed "unnecessary medication" to her patients. *Id.* at 3628. Campbell told her: "[T]hey are his patients and I will practice the way that he wants me to. And a lot of those patients were on high doses of medications when I got there." *Id.* She admitted that "what we did was wrong." *Id.* at 3609-10.

The United States also presented evidence of specific instances when Campbell prescribed a patient a thirty-day supply three days after Dyer prescribed the same patient a three-day supply. In Kentucky, a nurse practitioner, like Dyer, can only prescribe a three-day supply of controlled substances. [DE 289 at 2972]. Citing *United States v. Grunsfeld*, 558 F.3d 1231, 1235 (6th Cir. 1977), Defendants argue that evidence of this arrangement cannot support a conviction for conspiracy to distribute:

> There was no evidence that Campbell exercised direction or control over Dyer's prescribing practices; in fact, there was overwhelming evidence that each provider had independent authority to prescribe and prescribed as they saw fit. Additionally, the Government has not provided a single case or source for the presumption that independent prescribers exercising their independent prescribing authority pursuant to 21 C.F.R. § 1306.04 can be guilty of a conspiracy when they elect to independently prescribe.

[DE 272 at 1999].

The United States responds:

> Campbell makes much ado about nothing when arguing that a transferor-transferee relationship is not enough to prove a conspiracy and referencing circumstantial

evidence examples discussed in *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021). *Wheat* is inapposite as it was a street crime trafficking case where a conspiracy was charged between the seller and buyer. The *Wheat* case would be relevant had Campbell been charged in a drug conspiracy with a patient. However, in the present case, Campbell conspired with his clinic and other nurse practitioners to unlawfully distribute narcotics to numerous patients.

[DE 287 at 2934].

The Court agrees with the United States. Because there is sufficient evidence that they entered a conspiracy to unlawfully distribute controlled substances, it is unclear why it matters whether Campbell "exercised direction or control over" Dyer.

*Grunsfeld* does not support Defendants' argument. *Grunsfeld* did not involve a doctor and a nurse practitioner working in concert to unlawfully distribute controlled substances. Rather, it involved a conspiracy to distribute vast quantities of PCP. *Grunsfeld*, 558 F.2d at 1233. There, the Sixth Circuit found that there was sufficient evidence to support the conspiracy conviction:

> Here there is much more evidence than the simple act of purchase of PCP to tie these defendants to the conspiracy.
>
> DeMeglio worked closely with the other conspirators in providing an outlet for the PCP and arranged for a continuing relationship and extension of credit from Bert. Likewise, Eliason's involvement, while primarily consisting of purchases of the tablets, also was further evidenced by his representation to undercover agents of the Drug Enforcement Agency that he could get for them 1,000,000 tablets for PCP in ten hours and that his organization had sold 5,000,000 over the summer.
>
> Estes not only made purchases from Bert, but in June, 1972, drove in his own truck with Richard Flowers to Denver and returned to Detroit with additional chemicals for the production of PCP. He not only received $500 for his services, but a preferred price on the drug itself. We conclude that all of these circumstances distinguish the involvement here from that of a mere casual sale by someone who was unaware of the scope of the conspiracy. The fact that defendants were unable to purchase PCP on credit from Bert itself creates an inference of an on-going relationship with the conspiracy, as does the large volume of narcotics actually purchased.

*Id.* at 1235.

As in *Grunsfeld*, "there is more evidence than the simple act" of Campbell prescribing a thirty-day prescription after Dyer prescribed a three-day prescription to tie them to the conspiracy to unlawfully distribute.

A rational trier of fact could infer a "common plan" to unlawfully distribute controlled substances based on the volume and combinations of controlled substances prescribed and the expert opinions of Dr King and Dr. Denham. *See Avery,* 128 F.3d at 971. Likewise, a rational trier of fact could infer that Campbell issued a thirty-day prescription on the heels of Dyer's three-day prescription in furtherance of the conspiracy to unlawfully distribute controlled substances.

The Court recognizes that the jury acquitted Campbell and Dyer on the substantive drug counts (Count 2-5). [DE 266 at 1844-66]. Defendants assert that the acquittal on these counts affects the Court's Rule 29 analysis:

> [T]he Government seeks to sustain a conviction against a physician and a nurse practitioner despite any evidence of an agreement that the two (2) prescribed a medication unlawfully or even evidence that drugs were unlawfully distributed. Moreover, the jury unanimously found that the Defendants did not unlawfully distribute any of the prescriptions listed in the Bill of Particulars and the verdict form after a six (6) week trial and nearly three (3) days of deliberation.

[DE 271 at 1984].

But, the United States presented "evidence of an agreement that the two (2) prescribed a medication unlawfully" and evidence that "drugs were unlawfully distributed." Notably and as discussed in more detail above, the United States presented evidence about how Campbell and Dyer worked in concert to skirt around Kentucky's prescribing regulations. In addition, an acquittal on substantive counts does not necessarily undermine a conviction on a conspiracy count when that conviction, like this one, is supported by sufficient evidence. *See United States v. Rowan*, 518 F.2d 685, 689 (6th Cir. 1975) ("A jury is free to render inconsistent verdicts or to employ relevant evidence in convicting on one count that it may seem to have rejected in acquitting

on other counts"); *United States v. Powell*, 469 U.S. 57, 65 (1984) ("[I]nconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense"); *United States v. Hernandez*, 141 F.3d 1042, 1052 (11th Cir. 1998) ("Conspiracy and the substantive offense that is the object of the conspiracy are separate and distinct crimes. It is well established that acquittal on the substantive count does not foreclose conviction on the related conspiracy count") (internal citations omitted).

2. Pre-signed prescription pads and signing prescriptions without reviewing charts

Multiple witnesses testified that nurse practitioners had access to Campbell's pre-signed prescription pads. *See United States v. Chaney*, 921 F.3d 572, 592 (6th Cir.) ("[T]he government offered evidence that [the defendant] knew of Ace's practice of using pre-signed prescriptions and that she distributed the slips on occasion. This was sufficient evidence to show [defendant's] involvement in the conspiracy"). Antle saw pre-signed prescriptions in the office. [DE 298 at 3630-32]. Melody Dixon testified that Dyer possessed pre-signed prescription pads. [DE 305 at 3914]; *see United States v. Garrison*, 888 F.3d 1057, 1065 (9th Cir. 2018) ("Garrison need not have been aware of or participated in the full scope of the scheme—so long as he had agreed to further a portion of its illicit operations by colluding in writing fraudulent prescriptions, he could be convicted. There was sufficient evidence to lead a reasonable jury to conclude that Garrison had agreed to further the scheme run out of the Clinic to illicitly distribute OxyContin"). Doreen Doyle, a PPC employee who couriered charts and prescriptions to Campbell in Indiana, saw him sign prescriptions without reviewing the associated charts. [DE 315 at 4337-38]. Doyle's husband

was also a patient at PPC. *Id.* During one of her husband's appointments with Dyer, Dyer asked

him "what type of pills he would like." *Id.* Lola King, a medical assistant at PPC, also saw pre-

signed prescription pads:

Q. Do you know if in fact there were presigned prescriptions in the office?

A. There were.

Q. And tell us about that.

A. So when Dr. Campbell would go on vacation, he would leave four or five prescriptions with me to put in my desk drawer for the nurse practitioners 'cause their license would only allow them to sign up to a certain point on narcotics, so we had some patients that were on higher levels, and so if he was going to be gone, he would leave a few there in case they needed them in case those patients came in.

Q. Do you know who would have had access to those presigned prescriptions?

A. Any one of the nurse practitioners that would have came in and asked for it, they would have gotten it.

Q. Were they kept in a locked area?

A. Our door did not lock at all, no. They were just in my desk drawer.

[DE 313 at 4233-34].

Dr. Allen, a radiologist, worked at PPC for five years. [DE 290 at 3014]. He left in June

2016. *Id.* While at PPC, his primary duty was interpreting MRIs, ultrasounds, and CTs. *Id.* at

3015. Cindy Baird offered to pay for his DEA license, which had lapsed. *Id.* at 3016. Once his

DEA license was renewed, Cindy asked him to sign prescriptions for Campbell when Campbell

was out of town. *Id.* at 3017. Because Campbell was out of town often, Allen continued to sign

prescriptions for him. *Id.* He also signed prescriptions for of Dyer, Dr. Baird, and Dawn Antle.

*Id.* He signed prescriptions for Methadone, Oxycontin, Percocet, and Hydrocodone. *Id.* Although

he reviewed the patients' charts, he never physically examined the patients. *Id.* at 3018. He

testified that he signed prescriptions for other providers in 2014 and 2015. *Id.* at 3019.

Dr. Allen, like many other witnesses, testified about Defendants' conduct during the timeframe of the conspiracy which began "no later than January 1, 2009" and continued "on or about December 1, 2016." [DE 110 at 430]. Defendants assert, without citation to authority or further explanation, that "there was no evidence of the conspiracy's start date, end date, purpose of the conspiracy." For the Court's Rule 29 analysis, what matters is whether the United States presented sufficient evidence of the conspiracy during the relevant timeframe. *United States v. Farrad*, 895 F.3d 859, 872 (6th Cir. 2018) ("When 'on or about' language is used in an indictment, proof of the exact date of an offense is not required as long as a date reasonably near that named in the indictment is established") (internal quotation marks and formatting omitted); *United States v. Vassar*, 346 F. App'x 17, 22 (6th Cir. 2009) ("An indictment that is open-ended as to beginning dates but not end dates suffices"). The United States presented such evidence here. [*See, e.g.,* DE 305 at 3898 (testimony about 2012 through 2016); DE 290 at 3014 (testimony about 2011 to 2016); DE 315 at 4295 (testimony about 2013 through 2019)].

3. Ignoring red flags

Finally, in addition to expert and lay witness testimony about the volume and necessity of the prescriptions and the use of pre-signed prescription pads, the United States presented evidence that Defendants ignored red flags. Defendants ignored recommendations from drug counselors employed by PPC. [*See, e.g.,* DE 294 at 3301 ("[S]o there's a combination of opiates and benzos that are being prescribed essentially not paying attention to what the addiction counselor said")].

The jury also heard testimony from multiple witnesses about how Defendants responded (or failed to respond) to aberrant drug screens at PPC. Antle testified that she had no discretion to discharge patients with dirty drug tests. [DE 298 at 3563]. Rather, she was required to reroute them to Campbell. *Id.* Dixon also testified that patients who had "dirty" drug screens were referred

to Campbell and that despite the dirty drug screens some of them would continue to receive controlled substances after seeing him. [DE 305 at 3904-05]. Dr. Denham testified that Dyer prescribed drugs to PPC patients who tested negative for the drugs they were prescribed and positive for illegal drugs they were not. [*See, e.g.,* DE 284 at 2546-51]; s*ee United States v. Lee*, 966 F.3d 310, 318 (5th Cir.) ("A positive test for an illegal drug, such as cocaine, is a warning sign in flashing neon. Less apparent but no less damning is a negative test for a prescribed drug: it is a red flag that the so-called patient is selling medications rather than using them. Yet when many of Taylor's patients 'failed' drug tests—either testing positive for illegal drugs or testing negative for the drugs Taylor had prescribed them—he continued to sign off on scripts").

From the totality of this evidence, as well the other evidence in the record, a rational trier of fact could find that Defendants agreed to form, intentionally and knowingly entered, and participated in a conspiracy to unlawfully distribute controlled substances.

## B. Counts 10-19 and 22: Health care fraud counts[2]

To prove conspiracy to commit health care fraud, the United States must establish: "(1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). Direct evidence of intent to commit fraud is not necessary— circumstantial evidence from which a jury could draw reasonable inferences of intent to commit fraud will suffice. *United States v. Washington*, 715 F.3d 975, 980 (6th Cir. 2013). "[O]nce the existence [of] a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight." *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019) (second alteration in original) (quoting *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006)). A

---

[2] Defendants cited no legal authority in support of their arguments about the sufficiency of the evidence for these counts. [*See* DE 272 at 2000-007].

defendant commits health care fraud when he "knowingly and willfully executes . . . a scheme or artifice to defraud any health care benefit program," or uses "false or fraudulent pretenses, representations, or promises" to obtain money or property of a health benefit program. 18 U.S.C. § 1347(a).

The jury convicted Campbell, Dyer, and PPC of conspiracy to commit health care fraud. It found that they committed health care fraud by "falsely and fraudulently bill[ing] various health care benefit programs by coding physical therapy, counseling and exercise (Med Fit Program) services using evaluation and management codes in order to obtain higher reimbursement." [DE 266 at 1868, 1870, 1872].

The United States contends that Defendants fraudulently billed ancillary services under evaluation and management (E&M) codes and "misrepresented to government and private programs who was actually performing the service and the actual service being performed. Campbell established a bonus program to incentivize NPs like Dyer to refer patients to these ancillary programs." [DE 287 at 2949]. Defendants counter that they did not commit health care fraud because PPC's ancillary services could be billed "incident-to a physician." [DE 272 at 2001-06].

The Court summarizes below the United States' theory and proof on these counts (Defendants' billing of ancillary services using a 99214 E&M Code), Defendants' theory and proof on these counts (Defendants' billing of ancillary services "incident-to" the provider), and how a rational trier of fact could apply this evidence in deciding whether Defendants were guilty of the health care fraud counts.

1. Billing Ancillary Services Using a 99214 E&M Code

PPC provided ancillary programs to its patients, such as physical therapy, counseling, and exercise services (MedFit). Campbell established PPC's billing procedures. [DE 315 at 4297]. Witnesses testified that PPC's ancillary programs were billed to payers using a 99214 E&M code. A 99214 E&M code is:

> basically the second highest billing code for a follow-up visit. Typically it requires 20 minutes of face-to-face time or a moderate complexity case which means—and then you have to review at least . . . five review of systems, which a review of system is your eyes, your throat, your chest, and then you ask patients symptoms about what symptoms they're having.

[DE 312 at 4196; DE 284 at 2509].

Dr. Baird testified that the nurse practitioners at PPC "billed everything in 99214 . . . no matter how much time or how much complexity they spent with the patients." *Id.* at 4086. Ronald Cole, a licensed physical therapist, worked at PPC from spring 2012 until spring 2013. [DE 280 at 2420]. Cole observed nurse practitioners spend thirty seconds to one minute examining their patients who received ancillary services. *Id.* at 2425.

Antle also testified about Campbell's billing practices. She worked at PPC from 2012 to 2016. [DE 298 at 3560]. Campbell told Antle that he would fire her if she did not increase her bonus points by seeing more patients or ordering more tests. *Id.* at 3569. Campbell also told her what she needed to do to bill ancillary services using a 99214 E&M code:

> A. Well, I would go back after the patient was finished or sometime during the schedule and I would listen to their lungs and their heart and their stomach and that way you would be able to charge an office visit level.
>
> Q. How long would you stay back there with a patient?
>
> A. It's been less than a minute before because when it was explained to me how to do it, Dr. Campbell said all you have to do is run back there real quick listen to their lungs, their heart, and their abdomen.

Q. And then what would you do from there?

A. Go back to my office.

Q. I mean, was there any sort of chart you signed off on?

A. Yeah. Yeah. You checked 99214, I think. There's a code that makes it a full complete office visit and then sign it.

Q. And then signed off on it?

A. Yes, sir.

*Id.* at 3571.

Doreen Doyle worked in the billing department at PPC from 2013 to 2019. [DE 315 at 4340]. Billing supervisors gave everyone in the department a billing "cheat sheet." *Id.* at 4298. Doyle used the cheat sheet to input codes into AdvancedMD. *Id.* at 4310. PPC providers circled the codes on the fee sheet. *Id.* at 4307. Members of the billing department were neither allowed to circle the codes nor allowed to change them. *Id.* The billing department used Campbell's NPI and a 99214 E&M code to bill for these ancillary services. *Id.* at 4311, 4373; *see United States v. Hunt*, 521 F.3d 636, 646 (6th Cir. 2008) ("Julie Davis, Hunt's billing clerk, testified that it was Hunt who decided which codes to bill under. When Davis's testimony is combined with the rational conclusion that Hunt knew that neither he nor a nurse practitioner had seen the patients, a rational trier of fact could easily come to the conclusion that Hunt knowingly submitted improper billing codes in order to be paid for work that he had not actually performed"). Doyle testified that all PPC providers, including Dyer, referred patients to these ancillary services. *Id.* at 4312, 4318, 4322; *see United States v. Boccone*, 556 F. App'x 215, 237 (4th Cir. 2014) ("Considered in conjunction with Gisin's testimony that Boccone treated her, this was sufficient for the jury to infer that solely Boccone saw Gisin on that date and Frazier did not provide any medical services. Because Boccone caused claims to be submitted to Medicare falsely representing the provider who

performed services on the date charged, Boccone's health care fraud conviction is supported by substantial evidence").

### 2. Billing Ancillary Services "Incident-To" the Provider

Defendants assert that they did nothing wrong because these ancillary services could be billed "incident to" the provider. [DE 272 at 2001-06]. Sean Weiss, Campbell's medical billing and coding expert, discussed the requirements for billing services "incident to":

Q. Okay. Can you tell us the steps on what's required in order for a service to be billed incident-to a physician?

A. Certainly. Obviously, one, the first step is that the patient has to be established by a physician. There has to be an existing plan of care that's been created by the physician and/or by the nonphysician practitioner. Now, if it's a nurse practitioner or a PA who's going to be assuming the follow-up care of the patient at subsequent visits, then the initial encounter must be performed by a physician, and they must create the plan of care.

Q. So who actually can perform services incidental to a physician? And I believe if you wanted to–

A. Certainly. So individuals–so physician assistants, nurse practitioners, clinical nurse specialists, certified nurse midwives, clinical psychologists, clinical social workers, physical therapists, and occupational therapists all have their own benefit categories and may provide services without direct physician supervision and bill directly for the services. When their services are provided as auxiliary personnel under what's called direct physician supervision, they may have their services covered as incident-to services. So there's four things when I audit a medical record that I'm looking for.

Q. Okay.

A. The first is whether or not the service was an integral although incidental part of the physician's professional review.

Second, is that the service has to be commonly rendered without charge or included in the physician's bill.

Three, it has to be of a type that are commonly furnished in a physician's office setting or in a clinic.

15

And, finally, the fourth thing that I look for is that the services are furnished by the physician or auxiliary personnel under the physician's direct supervision, which means the physician has to be physically present in the office suite but not in the room at the time the services are being performed.

. . .

Q. Isn't one of the requirements for incident-to that services and supplies must be furnished in accordance with the applicable state laws?

A. Yeah. Incident-to, yes, and in order for a nonphysician practitioner to be able to provide incident-to services, depending on what their licensure is and what their provider type is, they'll fall under the state practice act. Yes, sir.

[DE 274 at 2303-04, 2380]

Mr. Weiss testified that there are "so many variations between . . . what's recognized by Medicaid at the basic state level versus what Medicare pushes forward versus what a Medicaid managed care recognizes versus what an HMO recognizes versus what a commercial payor recog – recognizes." *Id.* at 2299-300. Nonetheless, "the "basic concept of incident-to is universal across all payers with slight variances." *Id.* at 2300. Payers include both "federal payers," like the Center for Medicare and Medicaid Services, and "commercial payers," like United Healthcare, Aetna, Blue Cross, and Humana. [DE 278 at 2224]. On cross-examination, Weiss testified that PPC's ancillary services could only be billed "incident to":

Q. And we're kind of narrowing down now to what this–this case. You'd agree with me that from the documents you reviewed in this case, that Dr. Campbell was not performing any of the services that you reviewed?

A. I believe he was a supervising physician on these incident-to services.

Q. Well, he was the—and that was under your—the clinic—

A. Yes.

Q. –the clinical office model that you discussed—

A. Yes, sir.

16

Q. –earlier? So, I mean, therefore, we're not dealing with an issue of a physician directly billing for services that that physician provided?

A. Because they were provided by an ancillary staff member. Is that—

Q. Right, and so all of these services, in order to be billable, would have had to been incident-to?

A. That is correct.

[DE 274 at 2376-77].

Lee Guice, the Director of Policy and Operations for the Department for Medicaid Services in Kentucky, testified about whether Kentucky Medicaid allows for "incident-to" billing:

Q. Okay. And so does the Kentucky Department of Medicaid Services, do they permit "incident to" billing?

A. No, sir; not at all.

Q. Under any circumstances?

A. No circumstances.

Q. So for a provider that wants to bill Kentucky Medicaid, does that particular provider—do they have to be enrolled?

A. They have to be an enrolled Medicaid provider.

Q. And so if an enrolled provider wants to bill for a service, is that enrolled provider the one that actually has to do that service since you don't offer "incident to" billing?

A. Well, yes.

Q. Okay. So in other words, if a practice wants to bill for the service—to bill Kentucky Medicaid for the services done by a nurse practitioner, would the nurse practitioner need to be enrolled with Kentucky Medicaid?

A. Yes, sir.

Q. And would the nurse practitioner need to be the one that does the services?

A. Yes, sir.

Q. Okay.

A. Absolutely.

[DE 277 at 2201].

Jim Waddick, a coder from Indiana Medicaid, testified about Medicare, Indiana Medicaid, and Anthem guidelines. [DE 287 at 2943]. He testified that PPC's ancillary services should not have been billed using E&M codes:

Q. Okay. So you mentioned the requirements for physical therapy, counseling, and the exercise. Are you able to bill that as a 99214 office visit if a patient that receives one of those three services interacts with a provider and has their vitals and blood pressure taken?

A. No. Again, based upon what's documented in the medical record is what the service code should be billed. So if the content of the code—or of the note, for example, is counseling, then the service would be billed as a counseling service.

. . .

Q. Okay. And so in your experience with Indiana Medicaid, Medicare, and Anthem, would they reimburse for physical therapy, counseling, or exercise billed as a 99214 office visit?

A. No.

*Id.* at 2943-44.

Waddick testified about the requirements for billing physical therapy services under Indiana Medicaid:

Q. And what about—under the AMA guidelines, who typically performs the physical therapy services?

A. Under the AMA, it would be a physical therapist. Within the Indiana Medicaid program specifically, in order to render physical therapy services, one has to be a licensed certified physical therapist or a certified physical therapy assistant under the direct supervision of a physical therapist.

A. Once a physician determined that a patient needed physical therapy, they would have to request prior authorization from the Medicaid program for the therapy. And

18

the request would entail a summary from the physician or the physician's order indicating why they felt the patient needed the physical therapy, what types of physical therapy they needed, how often they would need it and, then, also, again, what modalities they would need for that. And then once the prior authorization is granted, they would render the services, as I said, through either a certified licensed physical therapist or a physical therapy assistant under the direct supervision of a physical therapist.

*Id.* at 2944.

He testified that only enrolled providers with Indiana Medicaid can bill it for their services:

Q. Okay. So we've kind of looked at the CPT code requirements. We've looked at evaluation and management in terms of reimbursement. So the final step, I guess, is that before a provider bills Medicare or Medicaid, does that provider have to be enrolled with CMS?

A. Yes, yes.

Q. And does Indiana Medicaid require a provider to be enrolled before billing for services?

A. Yes.

Q. Okay. And so when you look back between 2009 and April 2014, who from PPC was credentialed to bill Indiana Medicaid?

A. Dr. Jeffrey Campbell.

*Id.* at 2945.

Finally, Danielle Langdon, a certified coder, testified about billing for counseling services:

Q. That's fine. It's been years ago. And so they would—I guess patients would get counseling services there?

A. Yes.

Q. And then how were those billed?

A. Same as before. There's a 99214 office visit marked on this.

Q. Were there—are there specific CPT counseling codes?

A. Yes.

Q.  And were those codes used?

A.  No.

. . .

Q.  Ma'am, back again. So from the information that you put in the billing system, could the insurance company know who was providing that service for MedFit?

A.  No.

Q.  What about for PT or PM?

A.  No.

Q.  What about for counseling?

A.  No.

Q.  Why is that?

A.  The information that we put in the system to create that claim to bill to insurance would have had an E&M visit with the qualifying provider's information. There was no indication that it was anything other than an office visit done by a nurse practitioner or an MD.

Q.  And that's because it's listed as an E&M code?

A.  Yes.

Q.  And it's not a specific counseling code?

A.  Correct.

Q.  Or a specific physical therapy code?

A.  Correct.

[DE 292 at 3126-27, 3179].

She also testified about billing for counseling services "incident to":

Q.  So in this example where you've got—where you talk about providers must document a face-to-face time relating to the SBI—and you've got codes down here. You don't have a 99214 code listed here; right?

A.  Right.

Q.   Okay. So in this example, what would you need to bill a 99214 for these counseling sessions?

A.  The provider would have to see the patient.

Q.  Right. So incident to would not allow the counsellor to see the visit and then bill it under Dr. Campbell's name?

A.  Correct.

*Id.* at 3174-75.

3.  <u>Rational Trier of Fact's Application of Billing Standards and Expert Testimony to Evidence</u>

The United States admitted the patients' files associated with the health care fraud alleged in Counts 11-19.  [Gov't Ex. 3, 6, 8, 20, 25, 27, 31, 34, and 35].  The Jury Instruction for Counts 11-19 provided:

Counts 11, 12, 13, 14, 15, 16, 17, 18, and 19 of the indictment charge Jeffrey Campbell with health care fraud.  Specifically, the indictment charges that Jeffrey Campbell falsely and fraudulently billed various health care benefit programs by coding physical therapy, counseling, and exercise (Med Fit Program) services using evaluation and management codes in order to obtain a higher reimbursement rate for the following patients:

| Count | Dates | Patient | Service Performed | E&M Code |
|-------|-------|---------|-------------------|----------|
| 11 | August 26, 2013 | Robert Carter | Physical therapy | 99214 |
| 12 | April 10, 2014 | Heather Haydon | Med Fit (exercise) | 99214 |
| 13 | August 12, 2013 | Eugenia Logsdon | Counseling | 99214 |
| 14 | February 14, 2014 | Brandon McDonald | Physical therapy | 99214 |
| 15 | February 19, 2013 | Daphney Pollard | Counseling | 99214 |
| 16 | April 7, 2014 | Brenda Singleton | Med Fit (exercise) | 99214 |
| 17 | July 31, 2013 | Michelle Smith | Counseling | 99214 |
| 18 | April 15, 2013 | Terra Baker | Med Fit (exercise) | 99214 |
| 19 | August 1, 2013 | Kristy Brown | Counseling | 99214 |

[DE 258 at 1710].

The Jury Instruction for Count 22 provided:

21

> Count 22 of the indictment charges Jeffrey Campbell and Mark Dyer with health care fraud. Specifically, the indictment charges that on or about and between April 1, 2013 and March 31, 2014 Jeffrey Campbell and Mark Dyer falsely and fraudulently billed various health care benefit programs for physical therapy services using evaluation and management codes as if a physician performed a service on the patients, but in reality, a non-physician and non-physical therapist performed the services on the patients.

*Id.* at 1711.

Defendants contend that "Counts 10 through 19 and 22 are unsupported by sufficient evidence to sustain the convictions because the Government failed to present evidence establishing what the guidelines for billing these services were and that PPC devised a scheme or artifice to defraud health care benefit programs by submitting claims in contradiction to them." [DE 272 at 2006].

Waddick reviewed the patient files for Logsdon, Smith, and Baker, and concluded that Campbell did not properly bill the services rendered to those patients on the corresponding dates listed in the Jury Instruction for Counts 11-19. [DE 287 at 2945]. Moreover, in an expert report drafted just two months before the trial, Weiss opined that "only one of the 11 through 19, from the documents that [he] preview – [he] reviewed, supported a 99214 claim." [DE 274 at 2354, 2357]. But, after re-reviewing the files and interviewing Campbell, Weiss changed his opinion about whether a 99214 claim was properly billed in Counts 11-19. *Id.* at 2364. The Court instructed the jury:

> Ask yourself if the witness testified inconsistently while on the witness stand, or if the witness said or did something (or failed to say or do something) at any other time that is inconsistent with what the witness said while testifying. If you believe the witness was inconsistent, ask yourself if this makes the witness's testimony less believable. Sometimes it may; other times it may not. Consider whether the inconsistency was about something important, or about some unimportant detail. Ask yourself if it seemed like an innocent mistake, or if it seemed deliberate.

[DE 258 at 1674].

Viewing the evidence in the light most favorable to the United States, a rational trier of fact could believe Weiss's initial opinion that eight of the nine counts did not support a 99214 claim. *See United States v. Persaud*, 866 F.3d 371, 381 (6th Cir. 2017) ("This court has long held the view that the weight and credibility of the testimony of a party's expert witnesses were for the jury") (internal quotation marks and formatting omitted); *see also Bathory v. Procter & Gamble Distrib. Co.*, 306 F.2d 22, 25 (6th Cir. 1962) ("It was for the jury, however, to weigh the evidence, to determine the credibility of these [expert] witnesses and to cull the truth out of these seeming contradictions."); *Dickerson v. Shepard Warner Elevator Co.*, 287 F.2d 255, 259 (6th Cir. 1961) ("The weight given to lay and expert testimony and the credibility of such witnesses was for the jury to determine."); *Hunt*, 521 F.3d at 647 (The health care fraud "case against Hunt essentially boils down to the jury's choice between believing Hunt's claims to have made innocent mistakes and the Government's circumstantial proof that he knowingly committed fraud. After witnessing Hunt's demeanor and testimony, the jury decided that it simply did not believe his excuses. The jury found the Government's story to be more credible, and that decision is entitled to a high degree of deference"); *United States v. Croteau*, 819 F.3d 1293, 1306–07 (11th Cir. 2016) ("The jury was also free to disbelieve the testimony of Crotea's expert witness, Dr. Toomer, who opined that Croteau suffered from a delusional disorder. Based on the government's cross-examination of Dr. Toomer, the jury reasonably could have concluded that Dr. Toomer's evaluation of Croteau was not thorough to their satisfaction or even believable").

Furthermore, a rational trier of fact—reviewing the files of the patients listed in Count 11-19 and applying the billing standards testified to by Weiss, Guice, Waddick, Landgon, and others—could find that Campbell fraudulently billed for the services performed on the dates listed by using a 99214 E&M code. Multiple witnesses also testified about the requirements for billing

a 99214, which a rational trier of fact could also apply to the information (or lack of information) in those patient files to determine whether a 99214 was properly billed. *See United States v. Canon*, 141 F. App'x 398, 405 (6th Cir. 2005) ("[A] rational jury could infer a failure to perform from a failure to document. Such an inference is supported by the testimony of other witnesses concerning the importance of chart documentation . . . A finding that Dr. Canon did not perform all of the services for which he billed is consistent" with testimony that "the 99214–25 billing code is rarely used in a typical pain-management practice"); *see also United States v. Mahmood*, 820 F.3d 177, 187 (2016) ("Mahmood's own trial evidence reflected that proper coding or recoding of Medicare claims could not be done absent study of a patient's medical record. Yet, . . . Mahmood directed his employees to ignore medical records and to change primary diagnosis codes to reflect acute and chronic conditions that triggered higher Medicare reimbursements but that were unsupported by patients' medical records. Mahmood had not treated these patients or reviewed their records").

When considering Defendants' incident-to billing theory, it is important to remember that "alternative explanations alone, even if plausible, do not ordinarily overcome the defendant's burden in challenging the sufficiency of the evidence. This is because the law does not require the government to disprove every conceivable hypothesis of innocence in order to sustain a conviction on an indictment proved beyond a reasonable doubt." *United States v. Humphreys*, 468 F.3d 1051, 1054 (7th Cir. 2006) (internal citations, quotation marks, and formatting omitted).

As for the substance of Defendants' theory, Weiss testified that, despite some differences between how federal and commercial payers apply "incident-to" billing, "the "basic concept of incident-to is universal across all payers with slight variances." *Id.* at 2300. As a result, even though the patients in Counts 11-19 did not have the same health insurance, the jury could apply

the incident-to requirements discussed by Weiss to the patient files and the proof about the individual health care frauds counts to determine (as they did) that Campbell fraudulently billed for the ancillary services using 99214 E&M codes. Weiss testified that "[t]here has to be an existing plan of care that'd been created by the physician and/or by the nonphysician practitioner" and if a nurse practitioner is "going to be assuming the follow-up care of the patient at subsequent visits, then the initial encounter must be performed by a physician, and they must create the plan of care." [DE 274 at 2303]. Witnesses testified that patients were referred to PPC's ancillary services by nurse practitioners. Nurse practitioners Dyer, Antle, Lucretia Hovell, and Bridget Buckman testified that they did not establish a plan of care for their patients in the ancillary programs. [DE 287 at 2947]. Dr. Baird testified that he researched whether insurance would cover a program like MedFit and determined that it would not. [DE 312 at 4091]. And Defendants did not argue in their Rule 29 motion that Campbell (or any other doctor) created plans of care on the dates and for the patients listed in Counts 11-19.

Relevant to Count 22, the jury also heard copious testimony that ancillary services were not provided by qualified personnel. Cole testified that non-physical therapists at PPC performed physical therapy services. [DE 280 at 2422]. Cole expressed his concerns to Campbell:

> A. The following Monday—after Dr. Jones and I discussed it throughout the weekend, the following Monday Dr. Jones and I attempted to contact Dr. Campbell to have a meeting to discuss, you know, about this because this cannot be done. This is a definite violation of the Physical Therapy Practice Act and we cannot tolerate it being done. We couldn't contact Dr. Campbell directly, so we tried contacting Dr. Campbell through his office manager—his practice manager, Cindy Baird, and she assured us she was trying to contact him to set up a meeting. After several days that did not happen. Eventually several days later we got ahold of Dr. Campbell and we did set up a meeting to occur the following week.
>
> Q. And did you discuss with him your concerns about physical therapy services being offered without a physical therapist we did. And not only did we discuss it with him, but we brought printed copies of the Indiana Physical Therapy Practice Act and the Indiana Medical Practice Act to outline for him this can't be done.

Q. And what response did you receive?

A. Dr. Campbell's response to that was that he was a doctor, he'd been a—and doctors have been around longer than physical therapists and so therefore he would do what he wanted to do in his practice.

*Id.* at 2448-49.

Cole testified that Johnny Ferguson supervised the physical therapy program, even though he was a physical therapy technician, not a licensed physical therapist. *Id.* at 2422. Cole testified about the MedFit program and Mark Brandenburg's qualifications for running it:

Q. Are you also familiar with MedFit—the MedFit program?

A. I am.

Q. Can you tell the jurors about that particular—

A. There was a program set up at PPC that was run by an individual by the name of Mark Brandenburg. And this part of the building had gymnasium equipment in it. It had treadmills, stationary bicycles, hand weights, weight machine, and so forth. And patients—I would see patients go there to do therapeutic exercise, which raised my eyebrows because in my world—in the physical therapy world, therapeutic exercise is a modality that is supposed to be done by a physical therapist according to the state and Physical Therapy Practice Act. Therapeutic exercise is described as a physical therapy modality and now it's being done in this practice but it's not being supervised by a physical therapist. The definition is made more clear by the fact that these patients were performing this exercise because of a medical diagnosis that was given to them by either a physician or a nurse practitioner. That certainly meets the requirement under the Physical Therapy Practice Act to be a therapeutic exercise, so that was—was being done at MedFit.

Q. And do you know what Mr. Brandenburg's qualifications/credentials were?

A. I don't believe he had any.

*Id.* at 2344-45.

Dixon testified that she only knew Brandenburg because he was Campbell's "pool guy." [305 at 3916]. Sonya Gabbert, a physical therapist, worked at PPC for less than three weeks. [DE 276 at 2177]. She testified that non-physical therapists were providing physical therapy services.

*Id.* at 2193. She also testified that nurse practitioners were not supervising the employees providing physical therapy to PPC patients. *Id.* Instead, Ferguson, an athletic trainer, was doing so. *Id.*

The United States' evidence against Defendants is sufficient to support the jury's verdict that Dyer and Campbell both conspired to commit and did commit health care fraud.

## C. Count 24: Money Laundering

Defendants argue that "[d]ue to the insufficiency of the evidence on all of the theories presented by the Government to support the evaluation and management theories under Count 10, no conviction on Count 24 can be sustained." [DE 272 at 2007].

Internal Revenue Service Special Agent J.R. Stansfield "testified that reimbursements from health care benefit programs for health care claims fraudulently billed by the defendants were paid and deposited into PPC's operating accounts. Those funds were transferred from PPC's operating accounts into its payroll accounts and paid as bonuses to providers." [DE 287 at 2949]; *see United States v. Ruan*, 966 F.3d 1101, 1149 (11th Cir. 2020) ("As detailed above, Ruan made millions from health care fraud and distribution of controlled substances. The government traced those proceeds to the XLR Exotic Autos bank account used to purchase the cars. No more was required"). Antle testified that she was induced by the bonus program to bill unnecessary tests. [DE 298 at 3568]. Dr. Allen testified that the number of tests ordered by PPC providers increased significantly after Campbell started the bonus program. [DE 290 at 3020-21]. He also testified that Campbell told him that he could not "get the nurses to order these studies" until he started the bonus program. *Id.* at 3023. Finally, the United States presented evidence that Dyer not only received bonus payments, but received the highest amount of bonus payments of any nurse practitioner at PPC. Because the Court has found that the evidence supports the conviction for Count 10, it also finds the evidence is sufficient to support the conviction on Count 24.

### III.   <u>CONCLUSION</u>

For the reasons set forth above, and being otherwise sufficiently advised, **THE COURT ORDERS** that:

1) Defendants' Motion for Judgment of Acquittal Or, In the Alternative, For New Trial [DE 271; DE 272] is **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

September 10, 2021

cc: counsel of record